04 10832 JLT

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JAMES E. REID

Defendant.

MAGISTRATE JUDGE Dolan

Civil Action No.

**JURY TRIAL DEMANDED**

RECEIPT #
AMOUNT $ 150
SUMMONS ISSUED yes
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE 4/27/04

**COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**Summary**

1. In late 2001 and early 2002, defendant James E. Reid, a sales executive, perpetrated a fraudulent revenue recognition scheme at Firepond, Inc. ("Firepond"), a software company based at the time in Waltham, Massachusetts. Reid fabricated sales contracts purportedly worth more than $5 million between Firepond and three customers, causing Firepond to materially misstate its financial results for the fiscal quarters ended January 31, 2002 and April 30, 2002 in Forms 10-Q filed with the Commission and in earnings releases issued by the company. In addition, Reid caused Firepond to issue a materially false press release on February 27, 2002, that announced, as a "highlight of the quarter," one of Reid's fabricated sales contracts.

2. Reid evaded detection for nearly six months, enabling him to receive more than $200,000 in commissions and salary. While perpetrating his elaborate scheme, Reid forged agreements, signatures, and correspondence. He also prevented direct communication between Firepond employees and the purported customers by using third parties to impersonate the purported customers in telephone conversations with Firepond executives.

3. In late May 2002, Firepond's senior management became suspicious of Reid's fabricated sales contracts. After conducting an internal investigation, Firepond fired Reid and announced that it would reverse all revenue recorded on the fabricated sales contracts for the relevant quarters. On June 19, 2002, Firepond restated its financial results for the quarter ended January 31, 2002, and revised its financial results for the quarter ended April 30, 2002.

4. By engaging in the activities alleged in this Complaint, Reid committed fraud in the purchase and sale of securities in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Reid also circumvented Firepond's system of internal accounting controls, falsified its books and records or caused them to be falsified and made false statements to Firepond's chief financial officer in violation of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.13b2-1, 240.13b2-2]. In addition, Reid aided and abetted Firepond's uncharged violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§78m(a) and 78m(b)(2)(A)] and Rules 13a-13 and 12b-20 thereunder [17 C.F.R. §§ 240.13a-13 and 240.12b-20].

5. Unless restrained and enjoined, Defendant Reid will continue to engage in acts, practices, and courses of business as set forth in this Complaint or in acts, practices, and courses of business of similar object and purpose. Accordingly, the Commission seeks judgment providing for: (i) entry of a permanent injunction prohibiting him from further violations of the relevant provisions of the federal securities laws; (ii) disgorgement of all ill-gotten gains, plus prejudgment interest thereon; (iii) the imposition of a civil monetary penalty due to the egregious

nature of his violations; (iv) entry of an order prohibiting Reid from serving as an officer or director of a public company; and (v) other equitable relief.

**Jurisdiction**

6. This Court has jurisdiction over this action pursuant to Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

7. Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, practices and courses of business alleged herein.

8. The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 21 of the Exchange Act [15 U.S.C. § 78u].

**Defendant**

9. **James E. Reid** was an account executive at Firepond from March 2001 to February 2002, and was Acting Vice President of North American Sales from February 2002 until the company terminated him on May 29, 2002. In February 1993, in connection with an unrelated scheme in Canada involving forged and fraudulent sales contracts, Reid was sentenced to 19 months in jail after pleading guilty to five counts of fraud and one count of forgery.

**Related Party**

10. **Firepond, Inc.** is a Delaware corporation currently headquartered in Minneapolis, Minnesota. Firepond develops and licenses software used by manufacturers to facilitate the sale of heavy machinery products such as automobiles, aircraft, and construction machinery. Firepond's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is traded on the NASDAQ national market system.

## BACKGROUND

11. In March 2001, Firepond hired Reid as an account executive. Reid was responsible for selling Firepond's software and services to potential and current customers and for assisting with the implementation of the software by those customers. His compensation included a base salary, plus commissions he earned on the sales contracts he completed. Reid's sales region covered northeastern United States and portions of Canada.

12. Rather than sell Firepond's product to legitimate customers, however, Reid embarked on a fraudulent scheme to fabricate sales contracts with Bombardier, Inc. ("Bombardier"), a large equipment manufacturer based in Montreal, Canada, ABB, Inc. ("ABB"), an existing Firepond customer based in North Carolina, and Joy Mining Machinery ("Joy Mining"), a heavy equipment manufacturer based in Pennsylvania. As a result of these fabricated sales contracts, Firepond made material misstatements to public investors and Reid improperly received commissions and salary.

### Reid Fabricates a $3.5 Million Contract Between Firepond and Bombardier

13. Shortly after being hired by Firepond in March 2001, Reid met with Firepond's chief executive officer, Klaus Besier ("Besier"). In that meeting, Reid and Besier discussed several potential sales leads, including Bombardier, and Reid represented that he had business contacts at high levels within Bombardier. In August and September 2001, Reid attended approximately four meetings with Bombardier personnel to discuss Bombardier's potential purchase of Firepond's software products. As of September 2001, however, Bombardier personnel expressed little interest in purchasing Firepond's software.

14. Nonetheless, during the fall and early winter of 2001, Reid created the false impression that he was selling Firepond's software to Bombardier. Reid represented to Besier that he was negotiating contractual terms with Bombardier and was having detailed discussions with Bombardier's general counsel about a potential sale. Reid regularly provided Besier with status updates about the purported negotiations and discussed strategy with Besier about how to close the deal. In November 2001, Reid falsely told Besier that he had arranged a meeting between Besier and high-level Bombardier executives to finalize the agreement. Besier flew to Montreal, but upon his arrival, Reid told him the meeting would have to be rescheduled because the key Bombardier executives could not attend.

15. In fact, Reid was not in engaged in negotiations with Bombardier about the sale of Firepond software, and Reid had never arranged for a meeting between Besier and Bombardier executives.

16. On December 19, 2001, Reid provided Firepond management with an executed license agreement between Firepond and Bombardier worth at least approximately $3.5 million in revenue ("Fabricated Bombardier Contract"). The Fabricated Bombardier Contract contained the purported signature of Bombardier's Aerospace division president, Pierre Beaudoin. In reality, Reid had not reached an agreement with Bombardier and instead had forged Beaudoin's signature on the agreement. Reid was paid a $156,000 sales commission on this fabricated sale.

17. On January 8, 2002, pursuant to the Fabricated Bombardier Contract, Firepond shipped the software to Bombardier's Tucson, Arizona facility. On the same day, Firepond invoiced Bombardier for approximately $2 million CAD (approx. $1.3 million USD) for part of the software license fee pursuant to the terms of the Fabricated Bombardier Contract. Firepond's

customary procedure was to mail an invoice directly to the customer upon shipment of the software product. To evade detection, Reid circumvented this procedure by convincing a revenue clerk in Firepond's accounting department that Reid would hand-deliver the invoice to Bombardier. On or about January 8, 2002, the revenue clerk provided the invoice to Reid instead of Bombardier.

**Reid's Fraud Causes Firepond to Make Material Misstatements**

18. On February 27, 2002, after the close of the markets, Firepond issued a press release announcing its financial results for the fiscal quarter ended January 31, 2002 ("First Quarter Earnings Release"). The financial results reported in the First Quarter Earnings Release were materially misstated as a result of the Fabricated Bombardier Contract. Specifically, financial statements, which were attached to and discussed in the body of the release, falsely reported $57,000 of maintenance revenue from the Fabricated Bombardier Contract and $1.3 million of deferred revenue based on the invoice Firepond believed it had provided to Bombardier on or about January 8, 2002.

19. In addition, the First Quarter Earnings Release contained a section entitled "Highlights of the Quarter," which falsely stated:

> In the first quarter, Firepond closed nine new contracts, including a multi-million dollar deal with Bombardier, a world-leading manufacturer of business jets, regional aircraft, rail transportation equipment and motorized recreational products. Bombardier selected Firepond's SalesPerformer(TM) Suite to optimize its "lead to order" process, enabling its global sales force to sell more effectively and improve overall customer satisfaction.

20. Reid was substantially involved in drafting the Bombardier contract announcement in the First Quarter Earnings Release. Among other things, Reid participated in

drafting the wording of the announcement, and he told Firepond executives that he had consulted with Bombardier personnel about both the wording and the prominent treatment of the announcement within the release.

21. The First Quarter Earnings Release had a positive effect on Firepond's stock price. On February 28, 2002, the first trading day after the release was issued, Firepond's stock price closed at $1.10, an increase of approximately 10% from the previous day. Trading volume was double the previous day's volume.

22. On March 18, 2002, Firepond filed a Form 10-Q for the quarter ended January 31, 2002 with the Commission ("First Quarter Form 10-Q"). The First Quarter Form 10-Q also falsely reported $57,000 of maintenance revenue and $1.3 million of deferred revenue from the Fabricated Bombardier Contract.

**Reid Constructs an Elaborate Hoax to Avoid Detection**

23. In Firepond's second fiscal quarter of 2002, Reid engaged in elaborate efforts to evade detection of his fraudulent scheme. These included: (1) fabricating excuses for delays in implementing the Firepond software at Bombardier; (2) preventing access of Firepond employees to Bombardier personnel; and (3) using imposters to mislead Firepond employees into believing the Fabricated Bombardier Contract was legitimate.

24. In the first three months of 2002, Reid manufactured various seemingly plausible reasons for delaying the implementation of the software at Bombardier. First, Reid reported to Firepond's implementation personnel and executive officers that a major acquisition and reorganization of Bombardier would delay the project. Then, Reid claimed that two Bombardier divisions, Aerospace and Transportation, were competing internally to be the first to implement

the Firepond software and that the implementation would be postponed until that dispute was resolved. Finally, Reid claimed that a well-publicized labor strike at Bombardier would delay the project indefinitely.

25. Reid also exploited Bombardier's decentralized organization to further sustain his deception. In late March 2002, Reid arranged for Firepond personnel to meet with employees at Bombardier's Light Rail Division in Vienna, Austria. To set up the meeting, Reid told Bombardier personnel in Austria that Bombardier's corporate headquarters in Canada had already purchased the software. At that meeting, Firepond and Bombardier employees discussed implementation of the software. These meetings reinforced the perception of Firepond's management that Firepond had legitimately sold its software to Bombardier.

26. In early April 2002, Reid told Firepond management that another meeting with Bombardier about implementation was necessary. As he had done previously, Reid canceled the meeting at the last minute. This time, however, Reid arranged for an accomplice, posing as a Bombardier executive, to call Reid while he was in the presence of another Firepond employee. The accomplice, talking on a speaker phone that could be heard by the Firepond employee, apologized for having canceled the purported meeting. This ruse further reinforced the perception of Firepond management that the company had legitimately sold its software to Bombardier.

27. By mid-April 2002, Bombardier's payment on the January invoice was overdue. Firepond's chief financial officer, Susan LeDoux ("LeDoux"), asked Reid for the name of a person at Bombardier whom she could contact to discuss the late payment. Reid provided LeDoux with a telephone number for a person named "Lise Benoit," who Reid identified as the

chief information officer for special projects at Bombardier. Beginning on April 19, 2002, LeDoux left several voicemail messages for "Lise Benoit" at the number provided by Reid. The voicemail message stated that "Lise Benoit" worked in the accounting office for special projects at Bombardier. In reality, there was no Bombardier employee named "Lise Benoit."

28. On April 22, 2002, Reid faxed a forged letter to Firepond's accounting department that purported to confirm Bombardier's commitment to pay and its expectation that implementation would begin in mid-May. On its face, the letter appeared to be written on Bombardier letterhead and bore the signature of an actual employee of Bombardier. The letter also identified "Lise Benoit" as the Bombardier contact person for invoices and provided an address and telephone number. On April 24, 2002, LeDoux sent a letter by Federal Express to "Lise Benoit" at the address provided asking "Lise Benoit" to call her to discuss the overdue payment and attaching the contract, the invoices and the forged letter committing to pay. The letter was accepted at the address to which it was sent. After LeDoux received no response, she asked Reid for another contact person and number. To explain the lack of response, Reid first falsely told LeDoux that "Lise Benoit" had been out sick and subsequently that she was at an offsite training program.

29. In April and May 2002, under increasing pressure from LeDoux for confirmation of payment, Reid widened his scheme to include at least two additional accomplices. Reid set up two telephone calls between Firepond executives and people posing as Bombardier employees. Those calls continued to give the sale an appearance of legitimacy and directly resulted in Firepond's decision to continue to recognize revenue on the Fabricated Bombardier Contract.

30. On April 29, 2002, Reid organized a conference call among himself, LeDoux and "Lise Benoit." On the call, an accomplice claiming to be "Lise Benoit" confirmed that she had received LeDoux's April 24, 2002 letter. The accomplice told LeDoux that the payment had been delayed because of Bombardier's labor strike, that she needed Pierre Lortie, the chief operating officer of Bombardier, to authorize the payment, and that she expected it would be made by the week of May 13, 2002.

31. After the April 29, 2002 conference call, LeDoux and Besier told Reid that they wanted to talk to Peter Lortie to confirm that payment would be authorized. On May 19, 2002, Reid organized a conference call among himself, Besier and an accomplice claiming to be Pierre Lortie. During the call, the accomplice confirmed to Besier that the project would start and that payment would be made by June 13, 2002.

**Reid Falsifies Two Additional Contracts**

32. Reid also fabricated Firepond sales contracts with two other companies, ABB, based in North Carolina, and Joy Mining, based in Pennsylvania.

33. In 2000, ABB had purchased a license for one of Firepond's software products that allowed for 1,000 users. In late 2001, ABB personnel told Firepond executives that it was interested in a license that would allow additional users. Besier assigned Reid to negotiate an agreement for additional users.

34. Reid gave the impression to Firepond that he was negotiating with ABB in February and March 2002 by regularly reporting to Besier on the status of his purported negotiations. At the end of April 2002, Reid provided Firepond management with a purported

amended contract between Firepond and ABB, dated April 30, 2002, providing for $900,000 in license revenue.

35. In fact, ABB had not agreed to expand its original license, and Reid had forged the signature of an ABB employee on the purported amendment to the license agreement.

36. Reid also fabricated a contract with Joy Mining. Between February and April 2002, Reid reported to Besier and other Firepond executives that he was negotiating a sales contract with Joy Mining. At the end of April 2002, Reid provided Firepond with a purported contract dated April 29, 2002 worth approximately $450,000 in license revenue.

37. In fact, Joy Mining had not agreed to purchase the Firepond software, and Reid had forged the signature of a Joy Mining employee on the purported contract.

**Reid's Fraud Causes Firepond**
**to Make Additional Misstatements**

38. On May 22, 2002, after the close of the markets, Firepond issued a press release announcing its financial results for the fiscal quarter ended April 30, 2002 ("Second Quarter Earnings Release"). The financial results reported in the Second Quarter Earnings Release were materially misstated as a result of the fabricated sales contracts. Specifically, financial statements, which were attached to and discussed in the body of the release, overstated current revenue by approximately $1.8 million as a result of the fabricated Bombardier and ABB contracts. Firepond also falsely reported a total of approximately $2 million in deferred revenue from the fabricated Bombardier, ABB and Joy Mining contracts.

**Firepond Uncovers Reid's Fraud**

39. In late May 2002, shortly after issuing its Second Quarter Earnings Release, Firepond began to uncover Reid's fraud. At that time, Firepond employees began arriving at the facilities of ABB and Joy Mining to implement the Firepond software pursuant to the fabricated contracts Reid provided to Firepond. When the ABB and Joy Mining personnel appeared unaware of the fabricated sales contracts, the Firepond employees alerted their supervisor, who in turn contacted Besier.

40. Firepond executives soon confirmed that neither ABB nor Joy Mining had signed a contract with Firepond. Besier then contacted Pierre Lortie, of Bombardier, directly. Lortie stated in an e-mail to Besier that he did not recall speaking to Besier and had not contracted to purchase and pay for Firepond's software.

41. After communicating with Lortie, Besier invited Reid to a meeting on May 28, 2002, at Firepond's Minneapolis office, at which he intended to confront Reid. Before Reid left for Minneapolis, however, he was inadvertently sent a copy of Lortie's e-mail to Besier. Upon receiving the e-mail, Reid canceled his trip to Minneapolis. Reid told Besier that he knew he would be fired soon and offered to "fix the Bombardier problem."

42. On May 31, 2002, Firepond filed a Form 8-K with the Commission and issued a press release disclosing that it had "discovered that its acting vice president of sales was engaged in fraudulent behavior" and that it expected to revise its financial results for the first and second fiscal quarters of 2002. The company also announced that it had fired Reid after learning that he created fraudulent documents purportedly evidencing three significant sales transactions in those

quarters. By the close of the markets on the day the release was issued, the price of Firepond stock fell almost 25%, to 50 cents,

**Firepond Revises Its Financial Results**

43. On July 19, 2002, Firepond restated its financial results for the quarter ended January 31, 2002, and announced revised results for the quarter ended April 30, 2002. (Although the company had publicly announced its financial results in the Second Quarter Earnings Release when Reid's fraud was discovered, it had not yet filed its Form 10-Q for that quarter.) Firepond's restatement and revised results reversed the company's recognition of all revenue from the three fabricated contracts.

**Proceeds of the Fraud**

44. As a result of his fraud, Reid received approximately $156,000 in commissions on the Fabricated Bombardier Contract. He had not yet been paid commissions on the Joy Mining and ABB contracts when the fraud was discovered. In addition, between December 2001, when he began the deception, until he was terminated in May 2002, Reid was paid approximately $78,000 in salary by Firepond.

**FIRST CLAIM**

**Fraud in the Purchase or Sale of Securities**
**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5)**

45. Paragraphs 1 through 44 are hereby realleged and incorporated herein by reference.

46. Firepond's First Quarter Earnings Release dated February 27, 2002, Second Quarter Earnings Release dated May 22, 2002, and Form 10-Q for the quarter ended January 31,

2002 contained material misstatements that resulted from Reid's fraudulent conduct described herein.

47. By reason of the foregoing, Reid, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated as a fraud or deceit upon certain persons, including purchasers or sellers of Firepond's securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

48. Reid's conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial losses or significant risk of substantial losses to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

## SECOND CLAIM

**Falsification of Accounting Records, Circumvention of Internal Controls and Deception of Accountants (Violation of Section 13(b)(5) of the Exchange Act and Rules 13b2-1 and 13b2-2)**

49. Paragraphs 1 through 44 are hereby realleged and incorporated herein by reference.

50. As set forth above, Reid knowingly caused false entries to be recorded on Firepond's books and records by, among other things, fabricating sales contracts, forging

correspondence, lying to Firepond accountants and executives and using accomplices as imposters to evade detection.

51. By reason of the foregoing, Reid knowingly, directly or indirectly, falsified or caused to be falsified Firepond's books, records and accounts, circumvented Firepond's system of internal accounting controls and made materially false or misleading statements or omissions to accountants in connection with an audit or examination of Firepond's financial statements, Firepond's public filings, and Firepond's preparation or filing of documents or reports required to be filed with the Commission in violation of Section 13(b)(5) of the Exchange Act [15 U.S.C. §78m(b)(5)] and Rules 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.13b2-1, 240.13b2-2].

52. Reid's conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial losses or significant risk of substantial losses to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

## THIRD CLAIM

### Aiding and Abetting Firepond's Uncharged Reporting and Books and Records Violations (Aiding and Abetting Firepond's Uncharged Violation of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20 and 13a-13 Thereunder)

53. Paragraphs 1 through 44 are hereby realleged and incorporated herein by reference.

54. Firepond failed to file with the Commission such financial reports as the Commission has prescribed, and/or failed to include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make

the statements made therein, in light of the circumstances in which they were made, not misleading, and failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets in violation of Sections 13(a), 13(b)(2)(A) of the Exchange Act and Rules 12b-20 and 13a-13 [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 17 C.F.R. §§ 240.12b-20 and 240.13a-13].

55. By knowingly rendering substantial assistance to Firepond's violations and causing false entries to be made on Firepond's books and records, with knowledge that such information would be incorporated in Firepond's filings with the Commission, Defendant Reid aided and abetted Firepond's uncharged violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act, and Rules 12b-20 and 13a-13 thereunder.

**PRAYER FOR RELIEF**

56. Accordingly, the Commission respectfully requests that this Court issue a Final Judgment of Permanent Injunction and Other Relief:

A. Permanently restraining and enjoining Defendant Reid, his agents, servants, employees, and attorneys, and those persons in active concert or participation with him, and each of them from violating, directly or indirectly, Sections 10(b), 13(a), and 13(b)(2) of the Exchange Act and Rules 10b-5, 12b-20, 13a-13, 13b2-1 and 13b2-2 thereunder;

B. Ordering Defendant Reid to pay civil penalties pursuant to Section 21(d) of the Exchange Act;

C. Ordering Defendant Reid to disgorge sales commissions and salary totaling approximately $234,000 earned from and during the course of the fraudulent conduct as described above, plus pre-judgment interest;

D. Pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibiting Defendant Reid from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

E. Granting such other and additional relief as this Court may deem just and proper.

Respectfully submitted,

Walter G. Ricciardi
District Administrator

Ian D. Roffman (BBO # 637564)
Senior Trial Counsel

Philip C. Koski (BBO # 568073)
Branch Chief

Scott D. Pomfret (BBO # 641717)
Staff Attorney

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
73 Tremont Street, Suite 600
Boston, MA 02108
(617) 424-5900 ext. 119 (Roffman)
(617) 424-5900 ext. 209 (Pomfret)
(617) 424-5940 fax

Dated: April 27, 2004