UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
|  | : |
| Plaintiff, | :    C.A. No. 04-CV-10832-JLT |
| v. | : |
|  | : |
| JAMES E. REID | : |
|  | : |
| Defendant. | : |
|  | : |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANT JAMES E. REID

Plaintiff Securities and Exchange Commission ("SEC") files this memorandum in support of its Motion for Entry of Default Judgment Against Defendant James E. Reid ("Reid").

### PROCEDURAL HISTORY

On April 27, 2004, the Commission filed a Complaint alleging that in late 2001 and early 2002, Reid, a sales executive, violated the federal securities laws by perpetrating a fraudulent revenue recognition scheme at Firepond, Inc. ("Firepond"). On the same date, the Commission filed an Amended Complaint. Reid was served by hand in person with the Complaint and Amended Complaint on April 28, 2004. Reid failed to appear, answer or otherwise respond to the Commission's complaint. On October 6, 2004, the Clerk of Court entered a default against Reid pursuant to Rule 55(a) of the Federal Rules of Civil Procedure.

By this motion, the Commission seeks entry of a Default Judgment pursuant to Rule 55(b)(2) ordering Reid to (1) disgorge all ill-gotten gains he received from Firepond plus prejudgment interest thereon, (2) pay civil penalties, (3) be enjoined from future violations of the

securities laws, (4) be prohibited from serving as an officer or director of any public company. The SEC files a proposed Final Judgment by Default herewith.

## FACTUAL BACKGROUND

### A.    Introduction

In late 2001 and early 2002, Reid, a sales executive, perpetrated a fraudulent revenue recognition scheme at Firepond, Inc. ("Firepond"), a software company based at the time in Waltham, Massachusetts. Amended Complaint ("Compl.") ¶1. Reid fabricated sales contracts purportedly worth more than $5 million between Firepond and three customers, causing Firepond to materially misstate its financial results for the fiscal quarters ended January 31, 2002 and April 30, 2002 in Forms 10-Q filed with the Commission and in earnings releases issued by the company. Id. In addition, Reid caused Firepond to issue a materially false press release on February 27, 2002, that announced, as a "highlight of the quarter," one of Reid's fabricated sales contracts. Id.

Reid evaded detection for nearly six months, enabling him to receive more than $200,000 in commissions and salary. Id. at ¶2. While perpetrating his elaborate scheme, Reid forged agreements, signatures, and correspondence. Id. He also prevented direct communication between Firepond employees and the purported customers by using third parties to impersonate the purported customers in telephone conversations with Firepond executives. Id.

In late May 2002, Firepond's senior management became suspicious of Reid's fabricated sales contracts. Id. at ¶3. After conducting an internal investigation, Firepond fired Reid and announced that it would reverse all revenue recorded on the fabricated sales contracts for the relevant quarters. Id. On June 19, 2002, Firepond restated its financial results for the quarter

2

ended January 31, 2002, and revised its financial results for the quarter ended April 30, 2002. Id.

**B.** **Reid Fabricated a $3.5 Million Contract Between Firepond and Bombardier**

During the fall and early winter of 2001, Reid represented to Firepond's chief executive officer Klaus Besier ("Besier") that he was negotiating contractual terms with Bombardier and was having detailed discussions with Bombardier's general counsel about a potential sale. Id. at ¶14. Reid regularly provided Besier with status updates about the purported negotiations and discussed strategy with Besier about how to close the deal. Id. In fact, Reid was not in engaged in negotiations with Bombardier about the sale of Firepond software. Id. at ¶15.

On December 19, 2001, Reid provided Firepond management with an executed license agreement between Firepond and Bombardier worth at least approximately $3.5 million in revenue ("Fabricated Bombardier Contract"). Id. at ¶16. The Fabricated Bombardier Contract contained the purported signature of Bombardier's Aerospace division president, Pierre Beaudoin. Id. In reality, Reid had not reached an agreement with Bombardier and instead had forged Beaudoin's signature on the agreement. Id. Reid was paid a $156,000 sales commission on this fabricated sale. Id.

**C.** **Reid's Fraud Caused Firepond to Make Material Misstatements**

On February 27, 2002, after the close of the markets, Firepond issued a press release announcing its financial results for the fiscal quarter ended January 31, 2002 ("First Quarter Earnings Release"). Id. at ¶18. The financial results reported in the First Quarter Earnings Release were materially misstated as a result of the Fabricated Bombardier Contract. Id. Specifically, financial statements, which were attached to and discussed in the body of the release, falsely reported $57,000 of maintenance revenue from the Fabricated Bombardier

3

Contract and $1.3 million of deferred revenue based on the invoice Firepond believed it had provided to Bombardier on or about January 8, 2002. Id.

In addition, the First Quarter Earnings Release contained a section entitled "Highlights of the Quarter," which falsely stated:

> In the first quarter, Firepond closed nine new contracts, including a multi-million dollar deal with Bombardier, a world-leading manufacturer of business jets, regional aircraft, rail transportation equipment and motorized recreational products. Bombardier selected Firepond's SalesPerformer(TM) Suite to optimize its "lead to order" process, enabling its global sales force to sell more effectively and improve overall customer satisfaction.

Id. at ¶19.

Reid was substantially involved in drafting the Bombardier contract announcement in the First Quarter Earnings Release. Id. at ¶20. Among other things, Reid participated in drafting the wording of the announcement, and he told Firepond executives that he had consulted with Bombardier personnel about both the wording and the prominent treatment of the announcement within the release. Id.

On March 18, 2002, Firepond filed a Form 10-Q for the quarter ended January 31, 2002 with the Commission ("First Quarter Form 10-Q"). Id. at ¶22. The First Quarter Form 10-Q also falsely reported $57,000 of maintenance revenue and $1.3 million of deferred revenue from the Fabricated Bombardier Contract. Id.

### D.    Reid Falsifies Two Additional Contracts

Reid also fabricated Firepond sales contracts with two other companies, ABB, based in North Carolina, and Joy Mining, based in Pennsylvania. Id. at ¶32. Reid gave the impression to Firepond that he was negotiating with ABB in February and March 2002 by regularly reporting to

4

Besier on the status of his purported negotiations. Id. at ¶34. At the end of April 2002, Reid

provided Firepond management with a purported amended contract between Firepond and ABB,

dated April 30, 2002, providing for $900,000 in license revenue. Id. In fact, ABB had not

agreed to expand its original license, and Reid had forged the signature of an ABB employee on

the purported amendment to the license agreement. Id. at ¶35.

Reid also fabricated a contract with Joy Mining. Between February and April 2002, Reid

reported to Besier and other Firepond executives that he was negotiating a sales contract with Joy

Mining. Id. at ¶36. At the end of April 2002, Reid provided Firepond with a purported contract

dated April 29, 2002 worth approximately $450,000 in license revenue. Id. In fact, Joy Mining

had not agreed to purchase the Firepond software, and Reid had forged the signature of a Joy

Mining employee on the purported contract. Id. at ¶37.

**E.     Reid's Fraud Causes Firepond to Make Additional Misstatements**

On May 22, 2002, after the close of the markets, Firepond issued a press release

announcing its financial results for the fiscal quarter ended April 30, 2002 ("Second Quarter

Earnings Release"). Id. at ¶38. The financial results reported in the Second Quarter Earnings

Release were materially misstated as a result of the fabricated sales contracts. Id. Specifically,

financial statements, which were attached to and discussed in the body of the release, overstated

current revenue by approximately $1.8 million as a result of the fabricated Bombardier and ABB

contracts. Id. Firepond also falsely reported a total of approximately $2 million in deferred

revenue from the fabricated Bombardier, ABB and Joy Mining contracts. Id.

### F.    Reid Derived Substantial Proceeds from the Fraud

As a result of his fraud, Reid received approximately $156,000 in commissions on the

Fabricated Bombardier Contract.  Id. at ¶44.  He had not yet been paid commissions on the Joy

Mining and ABB contracts when the fraud was discovered.  Id.  In addition, between December

2001, when he began the deception, until he was terminated in May 2002, Reid was paid

approximately $78,000 in salary by Firepond.  Id.

### G.    Related Criminal Matter

On February 5, 2004, a federal grand jury sitting in Boston returned a criminal indictment

against Reid charging one count of mail fraud and nine counts of wire fraud in connection with

the conduct that forms the basis for this action.  See United States v. Reid, Crim. A. No. 04-

10031-WGY (D. Mass.).  A jury trial is currently scheduled for March 7, 2005.

## ARGUMENT

### I.    Liability Should be Imposed on Reid Based on His Default

Upon default, the factual allegations of the Amended Complaint are taken as true.

Brockton Savings Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 13 (1st Cir. 1985).  As the

First Circuit has stated, "there is no question that, default having been entered, each of

[plaintiff's] allegations of fact must be taken as true and each of its . . . claims must be

considered established as a matter of law."  Brockton Savings, 771 F.2d at 13.  Thus, the factual

allegations set forth in the SEC's Amended Complaint must be taken as true.  Accordingly, the

SEC is entitled to judgment against Reid on the question of liability.  The sole remaining issue is

the appropriate remedy.

6

As described below, the factual allegations of the Amended Complaint demonstrate that the Commission is entitled to judgment against defendant Reid on each count of the Amended Complaint.

**A.   Reid Violated Section 10(b) of the
Exchange Act, and Rule 10b-5 thereunder**

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder prohibit the use of fraudulent devices in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Violations of Section 10(b) and Rule 10b-5 (the "antifraud provisions") require a showing of scienter, which is defined as a "mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). Scienter may be established by a showing of recklessness. Lanza v. Drexel & Co., 479 F.2d 1277, 1305 (2d Cir. 1973); Hollinger v. Titan Capital, Inc., 914 F.2d 1564, 1569 (9th Cir. 1990). To establish a violation of the antifraud provisions of the securities laws, any misrepresentations and omissions must be material. TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. Id.

A primary violator of Section 10(b) is one who participates in the fraudulent scheme or other activity proscribed by the securities laws. SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1471 (2d Cir. 1996). Courts have held that an individual who has "substantial participation or intricate involvement" in the preparation of fraudulent statements may be primarily liable even though the individual did not actually make the statements. In re Enron Securities, Derivative & ERISA Litigation, 235 F. Supp. 2d 549 (S.D. Tex. 2003); Howard v.

7

Everex Systems, Inc., 228 F.3d 1057, 1061 n.5 (9th Cir. 2000) (citing In re Software Toolworks

Inc., 50 F.3d 615, 628-29 (9th Cir. 1994)); see also Carley Capital Group v. Deloitte & Touche,

L.L.P., 27 F. Supp. 2d 1325, 1334 (N.D. Ga. 1998) (holding that when a person, acting alone or

with others, creates a misrepresentation, the person can be liable as a primary violator).

Here, Reid fabricated sales contracts, lied to management, and caused Firepond to issue

misleading statements to the investing public and to make materially misleading filings with the

Commission. Accordingly, Reid violated Section 10(b) of the Exchange Act and Rule 10b-5

thereunder.

### B.    Reid Aided and Abetted Firepond's Violations of Section 13(a) and Section 13(b)(2)(A) and Rules 12b-20 and 13a-13 Thereunder

Section 13(a) of the Exchange Act and Rule 13a-13 thereunder require issuers such as

Firepond to file annual reports with the Commission containing current financial and other

information. 15 U.S.C. § 78m(a); 17 C.F.R. § 240.13a-13. Implicit in these provisions is the

requirement that the information provided be accurate. SEC v. Kalvex, Inc., 425 F. Supp. 310,

316 (S.D.N.Y. 1975) ("Clearly the requirement that an issuer file reports under Section 13(a)

embodies the requirement that such reports be true and correct, and a failure to comply with such

section would result in violations of the securities laws"); SEC v. IMC International, Inc., 384 F.

Supp. 889, 893 (N.D. Tex. 1974) ("The reporting provisions of the Exchange Act are clear and

unequivocal, and they are satisfied only by the filing of complete, accurate and timely reports").

Exchange Act Rule 12b-20 requires that these periodic reports contain all information necessary

to ensure that statements made in them are not materially misleading. 17 C.F.R. § 240.12b-20.

Section 13(b)(2)(A) of the Exchange Act requires each issuer to make and keep books, records

8

and accounts which, with reasonable detail, accurately and fairly reflect its transactions and the disposition of its assets. 15 U.S.C. § 78m(b)(2)(A). Scienter is not a requirement of a Section 13(b)(2)(A) claim. SEC v. World-Wide Coin Investments, Ltd., 567 F. Supp. 724, 751 (N.D. Ga. 1983).

Aiding and abetting liability requires proof of three elements: (1) an underlying primary violation; (2) a general awareness or knowledge by the alleged aider and abettor that his role was part of an overall activity that was improper; and (3) knowing and substantial assistance by the alleged aider and abettor of the conduct that constitutes the violation. 15 U.S.C. § 78t(e); SEC v. Fehn, 97 F.3d 1276, 1288 (9th Cir. 1996); Cleary v. Perfectune, Inc., 700 F.2d 774, 777 (1st Cir. 1983); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47-48 (2d Cir. 1978).

Reid aided and abetted Firepond's violations of Exchange Act Section 13(a), Section 13(b)(2)(A) and Rules 12b-20 and 13a-13. Firepond violated these provisions by including on its books and records and reporting in its Form 10-Q for the quarter ended January 31, 2002 revenue from the falsified transaction with Bombardier. As a result, Firepond inaccurately recorded and reported its revenue and failed to conform with Generally Accepted Accounting Principles (as required by Regulation S-X, 17 C.F.R. § 210.1-01, et seq.). In addition, the description of Firepond's financial condition in those periodic reports violated the reporting provisions by making untrue statements of material fact and omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. By falsifying the contract with Bombardier, Reid knowingly rendered substantial assistance to Firepond's reporting and books and records violations. Reid's elaborate attempts to cover up his

9

wrongdoing demonstrate that he was generally aware and had knowledge that his role was part of an activity that was improper.

### C.    Reid Violated Section 13(b)(5) of the Exchange Act and Rules 13b2-1 and 13b2-2 Thereunder

Section 13(b)(5) of the Exchange Act provides that no person shall knowingly circumvent or fail to implement a system of internal controls or knowingly falsify any book, record or account. 15 U.S.C. § 78m(b)(5). Section 13(b)(5) requires that a person act with scienter to commit a violation. Exchange Act Rule 13b2-1 prohibits any person from falsifying or causing to be falsified any books, records or accounts required to be maintained under Section 13(b)(2)(A) of the Exchange Act. 17 C.F.R. § 240.13b2-1. Rule 13b2-1 does not require a showing of scienter. SEC v. McNulty, 137 F.3d 732, 740-41 (2d Cir. 1998). Exchange Act Rule 13b2-2 prohibits an officer or director of an issuer from (a) making or causing to be made a materially false or misleading statement or (b) omitting or causing to be omitted a statement of a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading to an accountant in connection with a required audit or the preparation or filing of a required document or report. 17 C.F.R. § 240.13b2-2. The rule prohibits misrepresentations made to internal accountants as well as to independent auditors. Promotion of the Reliability of Financial Information and Prevention of the Concealment of Questionable or Illegal Corporate Payments and Practices, Exchange Act Rel. No. 15570 (February 15, 1979), 1979 SEC LEXIS 2141 ("The Commission intends that [Rule 13b2-2] encompass . . . the preparation of any required reports, whether by independent or internal accountants . . . ").

Reid knowingly violated Section 13(b)(5) of the Exchange Act and Rules 13b2-1 and

13b2-2 by, among other things, falsifying the Bombardier contract, and by providing false

documents and information to Firepond's management concerning Bombardier and the contract.

By doing so, Reid caused the creation of false books and records in violation of Exchange Act

Rules 13b2-1 and 13b2-2.

## II.    THE SEC REQUEST ENTRY OF A PERMANENT INJUNCTION, DISGORGEMENT OF ILL-GOTTEN GAINS PLUS INTEREST, A CIVIL MONEY PENALTY AND AN OFFICER-DIRECTOR BAR

### A.    Entry of a Permanent Injunction Against Reid is Appropriate

The Commission seeks injunctive relief, permanently enjoining Reid from further

violations of the federal securities laws. The authority of a federal district court to order

permanent injunctive relief in a Commission enforcement action is well established. See, e.g.,

SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998); SEC v. Commonwealth Chem. Sec., Inc.,

574 F.2d 90, 99-100 (2d Cir. 1978); SEC v. Management Dynamics, Inc., 515 F.2d 801, 807 (2d

Cir. 1975); SEC v. Benson, 657 F. Supp. 1122, 1132-33 (S.D.N.Y. 1987). Permanent

injunctions may be ordered as part of a judgment by default upon a finding by the Court that a

factual basis for such relief exists. See, e.g., SEC v. McNulty, 137 F.3d at 736-37; Management

Dynamics, Inc., 515 F.2d at 814.

Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act empower the

Commission to seek permanent injunctive relief upon a showing that (i) violations of the

securities laws have occurred, and (2) there is a reasonable likelihood that violations will occur in

the future. 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d); Commonwealth Chem. Sec., Inc., 574 F.2d at

99-100; SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1100-1101 (2d Cir. 1972); Benson,

11

657 F. Supp. at 1132-33. The primary purpose of injunctive relief is to deter future violations, not to punish violators. SEC v. Koracorp Industries, Inc., 575 F.2d 692, 697 (9th Cir. 1978), citing Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944). The legal standard applied to determine whether injunctive relief is warranted is whether there is a reasonable likelihood that the defendant will engage in future violations of the law. See, e.g., SEC v. Fife, 311 F3d. 1, 8 (1st Cir. 2002); SEC v. Cavanaugh, 155 F.3d 129, 135 (2d Cir. 1998); SEC v. First City Financial Corp., 890 F.2d 1215, 1228 (D.C. Cir. 1989); SEC v. Bonastia, 614 F.2d 908, 912 (3d Cir. 1980); SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 99-100 (2d Cir. 1978) (quoting Loss, 3 Securities Regulation 1976 (1961)); SEC v. World Radio Mission, Inc., 544 F.2d 535, 541 (1st Cir. 1976); SEC v. Universal Major Indus. Corp., 546 F.2d 1044, 1048 (2d Cir. 1976); see also Manor Nursing Ctrs., 458 F.2d at 1100.

        As discussed above, Reid violated federal securities laws by falsifying three separate contracts and then attempted to cover-up his wrongdoing. His conduct establishes a reasonable likelihood of future violations. Reid's violative conduct was egregious because he engaged in a manipulative scheme that he conceived, carried out and attempted to cover-up through various elaborate devices. Reid knowingly caused Firepond to issue a press release announcing false financial results that were reported in Firepond's Form 10-Q filed with the Commission. Moreover, Reid has not given any assurances that he will not violate the securities laws in the future. On the contrary, the egregiousness of this scheme, together with the fact that Reid has failed to defend this action against him, suggest that he will likely commit such violations in the future. Thus, a permanent injunction against violating the federal securities laws should be entered against Reid.

**B.    An Order of Disgorgement and Prejudgment
        Interest Thereon Against Reid is Appropriate**

It is appropriate for the Court to order disgorgement of the ill-gotten gains received by a

defendant, plus prejudgment interest thereon. See, e.g., SEC v. First City Fin. Corp., 890 F.2d

1215, 1230 (D.C. Cir. 1989).[1] The Commission requests that prejudgment interest be calculated

in accordance with the rate used by the Internal Revenue Service for tax underpayments,

compounded quarterly. 17 C.F.R. § 201.600(a). Here, the SEC has alleged and presented

evidence warranting an award of disgorgement against Reid of $234,000, which consists of

$156,000 in commissions and $78,000 in salary. In addition, the SEC requests that the Court

order Reid to pay prejudgment interest thereon of $29,641.39.

Accordingly, the SEC requests that the Court order Reid to pay a total of $263,641.39 in

disgorgement and prejudgment interest.

**C.    Imposition of a Civil Money Penalty is Appropriate**

In addition, the Commission respectfully requests that the Court impose a civil monetary

penalty against Reid. Under Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the

Exchange Act, the Commission may seek civil penalties for violations of the federal securities

laws. 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3). Like a permanent injunction, civil penalties

---

[1]      It is within the Court's discretion to assess prejudgment interest on disgorgement liability
to deprive the recipient of the unjust benefit of what would amount to an interest-free loan. See
SEC v. Moran, 944 F. Supp. 286, 295 (S.D.N.Y. 1996); SEC v. Cross Financial Services, 908 F.
Supp. 718, 734 (C.D. Cal. 1995). The rate established by the Internal Revenue Service for tax
underpayment is an appropriate rate for prejudgment interest because it reasonably approximates
the unjust benefit of the use of the money. See SEC v. First Jersey Securities, 101 F.3d 1450,
1476 (2d Cir. 1996), cert. denied, 118 S. Ct. 57 (1997); see also 17 C.F.R. § 201.600 (Rule 600
of the Commission's Rules of Practice). A chart containing the Commission's calculation of
Reid's pre-judgment interest liability according to this methodology for the period May 2002
through September 2004 is attached as Exhibit A to the Declaration of Scott D. Pomfret, Esq.

13

are imposed to deter the wrongdoer from engaging in similar misconduct in the future. Accordingly, the factors considered to determine the likelihood of future violations for the purposes of a permanent injunction, are also useful in assessing civil penalties. SEC v. Brethen, 1992 U.S. Dist. LEXIS 20665 at *104 (S.D. Ohio 1992). When determining the appropriate civil penalty to impose, the Court examines factors such as (1) the egregiousness of violations, (2) the isolated or repeated nature of the violations, and (3) the degree of scienter involved. Id.; see also SEC v. Deyon, 977 F. Supp. 510, 519 (D. Me. 1997); SEC v. Custable, 1996 U.S. Dist. LEXIS 19321, *13-14 (N.D. Ill. 1996). The Exchange Act provides that the amount of penalty is determined by the Court "in light of the facts and circumstances" of the particular case.

Here, as stated above, Reid conduct was egregious and repeated, and his elaborate scheme of cover-up, falsification, and impersonation are evidence of a high degree of scienter. In cases such as here where the defendant's conduct involved fraud and deliberate disregard of the federal securities laws and resulted either in substantial losses or created a significant risk of substantial loss, the Court is empowered to impose a third tier civil money penalty which is the greater of $110,000 per violation for individuals, or the gross amount of pecuniary gain received from the fraudulent scheme. 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3); 17 C.F.R. § 201.1002.

Accordingly, the Commission respectfully requests that the Court impose an appropriate civil money penalty for each of Reid's three fraud-based violations (one for each falsified contract).

14

## D.   Reid Should Be Permanently Barred from Serving as an Officer or Director of a Public Company

Pursuant to Sections 20(e) of the Securities Act and 21(d)(2) of the Exchange Act, the Court may bar a person from serving as an officer or director of a public company upon a showing that: (1) the person has violated one of the antifraud provisions; and (2) the person's conduct demonstrates substantial unfitness to serve as an officer or director.  15 U.S.C. §§ 77t(e), 78u(d)(2).[2]  Some courts have adopted a six-factor test to determine whether the Commission has met its burden.  See, e.g., SEC v. Patel, 61 F.3d 137, 141 (2d Cir. 1995); see also SEC v. First Pacific Bancorp, 142 F.3d 1186, 1193 (9th Cir. 1998), cert. denied, 525 U.S. 1121 (1999).  The six factors are (i) the egregiousness of the underlying securities violation; (ii) the defendant's repeat offender status; (iii) the defendant's role or position when he engaged in the fraud; (iv) the defendant's degree of scienter; (v) the defendant's economic stake in the violation; and (vi) the likelihood the misconduct will recur.  The Court has substantial discretion in determining whether to impose an officer and director bar and need not apply all of the factors in every case. Patel, 61 F.3d at 141.

An officer and director bar is appropriate against Reid.  As described above, Reid's conduct was egregious in that he personally falsified the three contracts in question and orchestrated an elaborate scheme of cover-up activity involving multiple accomplices and ruses. Reid acted with high levels of scienter.  He specifically withheld information from and/or misled Firepond's management concerning the false sales.  Reid benefitted personally from his conduct

---

[2]   Section 305 of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204 (2002), changed the standard from "substantial unfitness" to "unfitness."  Because of the egregiousness of Reid's misconduct, an officer and director bar against Reid is appropriate under either standard.

15

because his commission was based on the Bombardier contract, and he stood to benefit further from commissions on the ABB and Joy Mining contracts. Finally, Reid has not accepted responsibility for his conduct and he has ignored this enforcement action. Accordingly, the Commission respectfully requests that the Court enter judgment barring Reid from serving as an officer of director of a public company.

## CONCLUSION

For the reasons set forth above, the SEC respectfully requests that the Court enter a Final Judgment by Default against Reid in the form submitted herewith.

Dated: October 21, 2004
      Boston, Massachusetts

Respectfully submitted,

Ian D. Roffman (BBO No. 637564)
Scott D. Pomfret (BBO No. 641717)
ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
73 Tremont Street, 6th Floor
Boston, Massachusetts 02108
(617) 573-8900  ext. 8987 (Roffman)

## Certificate of Service

I, Ian D. Roffman, hereby certify that on October 21, 2004, I caused a true and correct copy of the foregoing Plaintiff's Memorandum of Law in Support of its Motion for Entry of Default Judgment Against Defendant James E. Reid to be served by first class mail, postage prepaid, upon James E. Reid, 400 Mossom Place, Waterloo, Ontario, CANADA.

Dated: October 21, 2004

Ian D. Roffman